United States District Court
Eastern District of Michigan

United States of America,

v.  Hon. Bernard A. Friedman

Michael Grimes,  Case No. 19-20520

  Defendant.
                                             /

## Government's Sentencing Memorandum

For 28 years, Michael Grimes was a leader in the UAW. He rose steadily through the ranks before eventually becoming a top aid to multiple UAW-GM vice presidents. Rather than employ his increased responsibility to advocate for his union brotherhood, Grimes manipulated his leadership role and demanded bribes and kickbacks from vendors of the UAW-GM joint training center, the Center for Human Resources (CHR). For twelve years, Grimes's "pay to play" scheme reaped over $1.5 million which he spent on property, houses, cosmetic surgery for a relative, and other items that never benefited the UAW membership. Despite the severity of these crimes, the government acknowledges Grimes's prompt agreement to accept responsibility for

1

his actions and his significant cooperation in this investigation, and recommends a sentence of 24 months' imprisonment.

## I.   Factual & Procedural History

### A. Grimes's Career with GM

Grimes began his career with GM working at a plant in Flint, Michigan, in 1972. Nine years later, he started his rise within the UAW ranks. He ascended from a UAW committee position, to plant chairman, to his appointment as a UAW international representative. In 2006, Grimes became an assistant director to the UAW president. One year later, he began serving on the CHR's executive board which manages operations and authorizes all budgets involving CHR funds.

From 2010, through his retirement on July 1, 2018, Grimes served as a top aid to multiple UAW-GM department vice presidents, one of whom was his co-defendant, Joseph Ashton. His position within the union and on the executive board of the CHR carried with it a fiduciary duty to both the UAW and the CHR to ensure that each organization's money was spent lawfully and ethically. A duty Grimes handily ignored. Instead, he used his access to and influence over the bidding process to corrupt his relationship with vendors.

B. <u>Grimes Meets Vendor A</u>

One of those vendors was Vendor A. Vendor A met Grimes in 2000, while Grimes was a servicing representative overseeing Delphi, American Axle, and other GM companies. Vendor A owned and operated an American-made clothing and accessories store. Vendor A fulfilled orders from UAW customers for products bearing the UAW logo. Vendor A also had "brick and mortar" stores inside multiple GM manufacturing plants throughout the United States where they sold clothing and other items bearing the UAW logo. Vendor A's business with the UAW, while substantial, was not a sure thing. Vendor A depended on UAW officials, like Grimes, to recommend, select, and approve him as a vendor of UAW merchandise.

C. <u>Grimes's Bribery and Kickback Scheme with Vendor A</u>

Grimes's recommendations were neither lawful nor altruistic. He expected something in return. In 2006, Grimes began demanding between $2,500 and $5,000 in cash each month from Vendor A, in exchange for Grimes's assistance with keeping Vendor A's stores open in the GM plants. The same year, Grimes recommended Vendor A as

the supplier for an order of 23,000 watches for UAW members. Vendor A won the contract. After Vendor A had committed to the production of the watches with the manufacturer, Grimes approached Vendor A and asked for a loan of $75,000 to purchase property in Rose Township, Michigan. Vendor A eventually ceded to Grimes's demands and agreed to draw up a contract in the amount of $60,000, so that Grimes could buy the vacant land.

Accompanying the $60,000 mortgage contract was a "consulting agreement" between Vendor A and Grimes which boldly memorialized Grimes's scheme to use his leadership position to benefit himself:

> 2.2. **Compensation and Obligations.**
> ▮▮▮▮ will pay Consultant the compensation, as defined above, at the end of the term, providing that the consultant secures the "watch order" or provides alternative new business of equal value and profitability and ensures the continuation of existing UAW business and secures any new UAW clothing /voucher stores controlled by the General Motors Department. ▮▮▮▮ will pay the additional compensation, during the term, so long as ▮▮▮▮ continues its' present level of UAW business, UAW clothing/voucher store locations and secures all new UAW clothing/voucher stores controlled by UAW department. Other than the compensation and the additional compensation,

The agreement dictated that in addition to the lump sum of $60,000, Vendor A would also pay Grimes $1,800 per month for the duration of the one-year contract. In return for the money, Grimes would act as a consultant and assist in securing the watch order or provide other new

4

business of equal value, ensure the continuation of existing UAW business, and secure any new UAW clothing/voucher stores controlled by the GM department. The agreement also required Vendor A to continue making monthly payments to Grimes as long as they secured new UAW stores, and maintained their UAW business contracts and store locations in the plants.

After the contracts were signed, Vendor A wrote a $60,000 check to Grimes for the property. Grimes never repaid this money. Around the same time, Grimes also asked Vendor A to fund a $10,000 cosmetic procedure for Grimes's relative. Vendor A agreed and wrote a check directly to the doctor who performed the surgery. Following the expiration of the one-year contract, Grimes continued making monthly requests for kickbacks from Vendor A, which Vendor A paid in cash.

In 2011, Grimes convinced a GM executive to purchase over 50,000 jackets to provide to UAW members. Grimes ensured that Vendor A was the supplier. After a jacket sample was selected and production had begun, Grimes demanded $525,000 from Vendor A toward a house he was purchasing in Fenton, Michigan. Grimes told Vendor A that if he refused the request, Grimes would cancel the jacket

5

contract. Vendor A tried to reject Grimes's demands, but ultimately agreed to give Grimes a $530,000 cashier's check ($525,000 plus a $5,000 penalty for Vendor A's initial refusal) payable to Grimes's relative. Grimes gave the $530,000 cashier's check to the title company in order to complete the purchase of the $630,000 Fenton house. The $100,000 down payment for the home also came from Vendor A in the form of four $25,000 checks which Grimes directed Vendor A to write to Grimes's relative's sham consulting company.

In 2016, Vendor A was awarded another multi-million dollar contract. This time, the order was for 55,000 embroidered backpacks for UAW members. In exchange for the $5.8 million contract, Grimes demanded $1 million from Vendor A. They settled instead on a kickback of $500,000 to Grimes. In connection with this contract, and in order to provide proof of income to obtain a mortgage for a house in Florida Grimes was buying, Grimes demanded that Vendor A author three fraudulent invoices which purported to pay Grimes's relative for consulting services on the backpack order.

D. <u>Grimes's Kickbacks from Vendor B</u>

Between 2013 and 2014, Grimes also benefited from the kickbacks his co-defendant and then UAW-GM vice president, Ashton, received from Vendor B, a company that supplied 58,000 watches to the CHR. None of the watches produced as part of this nearly $4 million contract were distributed to UAW members. Nevertheless, Grimes received $25,000 in kickbacks from this order. To conceal the scheme to defraud, Grimes's co-conspirators wrote the words "antique furniture" in the memo line of each check.

E. <u>Grimes's Arrest and Cooperation</u>

After agents executed a search warrant at Grimes's residence in Florida in March 2019, Grimes quickly agreed to cooperate with the investigation. He pleaded guilty in September of 2019 to one count of conspiracy to commit honest services wire fraud, and one count of conspiracy to commit money laundering.

## II. Guidelines

Grimes's guideline range is 46 to 57 months (23/I). There is no dispute between the parties as to the guideline range. In light of Grimes's significant cooperation, the government moves this Court to reduce his guideline range and sentence him to 24 months in prison.

## III. Argument

Title 18, United States Code, Section 3553 details a number of considerations for the Court to take into account when imposing sentence. For Grimes, the most important are the nature and circumstances of the crime, the need to reflect the seriousness of the offense, to provide just punishment, and to promote adequate deterrence. 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A).

A. The Nature and Circumstances of Grimes's Crimes

A third-generation GM employee, Grimes spent over half of his life as a UAW member. His hard work and diligence caused Grimes to rise swiftly through the union ranks. However, rather than use this increased power and influence to serve the UAW, Grimes corruptly served himself by lining his pockets with money that was not his to

take. Grimes appears genuinely remorseful for the crimes he committed and regrets the pain he has inflicted on the UAW membership, his coworkers, and his family; however his actions should have consequences which is why the government requests a sentence of imprisonment.

    B. <u>Reflecting the Seriousness of Grimes's Crimes and Providing Just Punishment</u>

There is no question that Grimes's crimes are serious. His initiation of multiple schemes to defraud the UAW and the CHR and accept over $1.5 million in bribes and kickbacks is undoubtedly a grave offense. And while it is certainly true that Vendor A was a willing participant in these conspiracies, Grimes was the author and instigator of the crimes. Rather than focusing on obtaining the UAW vendor with the highest quality and most economical products, Grimes instead concentrated on amassing wealth and using that money to buy new houses, fund his relative's plastic surgery, and generally enhance his own life. Ultimately, Grimes placed his drive for personal enrichment ahead of his fiduciary responsibilities to the UAW and the CHR, and for that he should be punished. 18 U.S.C. § 3553(a)(2)(A).

### C. The Need to Deter Similar Crimes in the Future

Grimes's level of remorse suggests that specific deterrence should not be a significant consideration for this Court when imposing sentence. 18 U.S.C. § 3353(a)(2)(B). However, as the government's prosecution of the UAW has revealed, the culture of corruption within the senior leadership of the UAW is systemic. The need to transform the unethical, greedy, and self-indulgent behavior characteristic of the UAW leadership is long overdue. Labor union members depend on their leaders to advocate aggressively for the benefit of the membership and their families. When senior union officials like Grimes fail to honor these responsibilities and positions of trust, their corruption must have consequences. A prison sentence will hopefully deter future union leaders who may be tempted to engage in similar criminal conduct.

## IV. Conclusion

The government requests a sentence of 24 months' imprisonment.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/Eaton P. Brown
Eaton P. Brown
Frances Carlson
Assistant United States Attorneys
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: eaton.brown@usdoj.gov

Dated: February 11, 2020

## Certificate of Service

I hereby certify that on February 11, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Michael P. Manley

/s/Eaton P. Brown
Eaton P. Brown
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: eaton.brown@usdoj.gov